Our next case is VernetX v. Apple, 2022-15-23. Mr. Tirofei, I've known you already. You were on the 135 patent. Yes, the 135 patent, Joanna. Joanna, and may it please the Court. This appeal presents both a procedural and a substantive challenge to the PTO's decision below. As to the procedural challenge, which is a threshold issue, the Board did not provide VernetX with proper re-hearing. Prior to the Supreme Court's decision in RFREX, VernetX filed a petition for panel re-hearing. In that request, VernetX also preemptively and prospectively requested any relief that the Supreme Court will provide in its forthcoming decision. Relying on internal agency guidance, which was promulgated after VernetX requested re-hearing, the Board construed VernetX's request as waiving panel re-hearing in favor of direct review. That was improper. The PTO's guidance, which the Board invoked, did not even address inter-parties re-exams, and so could not have deprived VernetX of its right to panel re-hearing under existing regulations. More importantly, there is a question whether Commissioner Hirschfeld even reviewed the merits of VernetX's request. We say so because in opposing VernetX's request, Apple argued, invoking the PTO's internal guidance, that VernetX was not entitled to request direct review because RFREX did not apply to re-exams. The PTO itself identified that as a lead issue in VernetX's request, and Commissioner Hirschfeld's unreasonable order does not indicate the specific basis for denial, and whether he agreed with it. Is there something about the character of Commissioner Hirschfeld's denial of direct review that somehow signaled that he felt precluded from even considering the merits of your request compared to other Commissioner Hirschfeld denials of other requests for direct review? Or is the character essentially the same? They all uniformly say just denied without really any further explanation. Your Honor, they're the same. So the order was just like a two-sentence order. That review was denied. The board's decision is the final decision for the agency. They are analogous, if not the same, to similar denials that he should have been subpoenaed in requests. So what I'm wondering is if he felt like he was precluded from engaging in any form of direct review for an inter-parties re-examination, wouldn't he have indicated that in his denial? Instead of a denial, perhaps a dismissal of the request for review. Your Honor, I think we fundamentally don't know that. The only piece of evidence suggesting that, in fact, he may have felt he was precluded was the fact that the PTO on its own identified the question whether RFRAC 7 applied to inter-parties re-exams as the lead issue in our request for a hearing. We certainly did not raise that issue and did not argue that in our request for a hearing. So even though the form is, we do agree, the form of the order was the same as the denials that he issued in requests dealing with IPRs and PGRs, still the fact that there was no reasoning provided and that that issue was identified by the PTO suggests that Commissioner Hirschfeld may have felt, because he already had the steel-spun authority to review decisions in inter-parties re-exams, that the Burnettics did not have a right to petition for direct review from a re-exam. The board, the PTO, or the decision-maker on this, read your re-hearing petition as, in effect, asking for direct review, as I understand their argument. That was their interpretation of what you were doing, based on the last sentence of your re-hearing petition before the conclusion. Is that a fair characterization, as you view it, as to what happened before the PTO? That is a fair characterization. Well, let me finish, then, the question, which is, if that's right, then had you not had that sentence in your petition, presumably you would have gotten Board of Review. That's what I understand, the takeaway from what the PTO did. So why isn't it at least reasonable for them to assume from that sentence that you were asking for something which presumably would result in some form of director review? If the Supreme Court held that director review, under certain circumstances, was mandatory. Your Honor, we actually do agree that it was reasonable for the board to construe us as also asking for whatever the Supreme Court would provide, which ended up being director review. The board also relied not just on the request to not petition, but also on its internal guidance, which said if you submit a petition for panel re-hearing and a request for director review, you cannot receive both, you can only receive director review. So it effectively construed our request for perspective relief for whatever Supreme Court may order in this decision, us waiving our right to a panel re-hearing. But we do think that, as I mentioned, we think our stronger basis is that it is impossible to determine, in our view, from the content of the order, whether or not we actually received re-hearing by the director on the merits, as opposed just to denial because Commissioner Hirschfeld took a position that requests for director review may not be submitted in re-exams. Turning to the substance, we have several arguments. First, we think that claiming confusion over the wording of the authorization limitation in Claim 18, the board analyzed the claim not as it was written, but in a way that erased various requirements from that limitation. The board said that it would decide whether, as a general matter, the prior authority is determining whether a client has permission to access a website, and if not, returning the error message. This is at Appendix 31. In our blue brief on pages 23-24, we give several examples where I've actually erased certain specific limitations from the authorization limitation of Claim 18. But I'd like to give just one example here. The board, and that relates to the board's analysis of Bloom, which is one of the VAS and CAN Bloom combinations on which the board relied for obviousness. The board found that Bloom discloses use of protocol filters and that, I quote, a narrow message may be returned to a client, close quote, open quote, when services are not available to a client computer. This is Appendix 32. But Bloom only discloses returning a narrow message when available DNS services cannot resolve the host name. It does not disclose returning a narrow message when the client lacks authorization to access a website, which is what was claimed in Claim 18. So given the board's reliance on Bloom for the client authorization recitation, we think that this requires vacature of the board's rejection of Claim 18 on the basis of the VAS and CAN and Bloom combination. And we think more generally the board's rephrasing of Claim 18 also requires vacature of the parallel rejections based on the bingo references. The other issue I'd like to address is the board's reliance on collateral estoppel. Why do you think that the board's missing characterization at page 30 of the Appendix 31 affects their analysis of bingo? And why do you think their analysis of bingo is incorrect? Your Honor, we think that it's... Under your construction of Claim 18, let's say. I think under construction it's just that the, you know, we think there are several specific limitations in Claim 18 that the board just did not look at. For instance, it read out the requirement that termination be performed prior to automatically initiating the VPN before the client and the target computer. It also then re-characterized the limitation which said determining whether the client computer is authorized to resolve addresses of non-secure target computers is simply determining whether a computer has permission to access a website. And it changed, as I mentioned, returning an error from the DNS request to simply returning an error message. So we think this was just a significant reframing and rephrasing of Claim 18 that would also affect the bingo references. And we have additional arguments with respect to bingo I can turn to them. One is that the board, for instance, it expressly said, and this is on page Appendix 45, it expressly stated that the bingo does not expressly disclose returning an error message should authentication fail. But then it nevertheless found authentication because it said it didn't think credible that a skilled artisan would not have immediately understood. This is the Genentech-NIDEC argument? Exactly. Okay, suppose that we were to conclude that what the board was saying was more like Genentech in that it was saying that the limitation is there, it's just not expressly stated, as opposed to that a person of ordinary skill would imagine that the extra limitation could be met by the disclosure. A nice distinction, but one that Genentech recognizes as being different in that the first category would say that can be anticipation. Why isn't this case on the Genentech side of the line as opposed to the NIDEC side of the line? That is certainly one reading of Genentech, their distinction. We think this is different from Genentech because in Genentech there was a disclosure that all the steps will be performed within a particular range, and then the question was can one of these steps, what is the temperature range at which one of these steps will be performed? So we think it is different from this case where the board said that the reference does not disclose a particular feature. And we think also that this court can look at Kenametal, another case which was discussed in NIDEC, and there, as the court in NIDEC explained, there the prior disclosed 15 specific combinations, and then one of those anticipated, and there was no question that the limitation would fall within one of these 15 disclosed combinations. So we do think that we are on the NIDEC motor side and not on the Kenametal and Genentech side in this divide. You can have inherent anticipation though, right? I mean you can make findings that even though a certain claim limitation is not expressly disclosed in the prior art, there could be a legitimate finding that it inherently exists in that reference. Yes, Your Honor. Yes, certainly you can have. So I guess that's what, just further developing your colloquy with Judge Bison, I mean that's one way to understand what the board is doing here. And then if so, then it would be permissible as a legal matter, and it wouldn't necessarily be a NIDEC situation where the fact finder here would just be imagining that you could add on an error message to a prior art reference that lacks an error message. Your Honor, I think if this court reads the board's decision as basically finding a limitation to be inherent, and I would agree with the court, we do think that here the board really performed exactly what NIDEC motor said it should not, where it said once a person's skill, the limitation is not present, but the person's skill of the art would immediately envisage it. So we think just the language... Well, it would be understood as the language that the board used as opposed to immediately envisage, which is the language. It's again a fine distinction, but envisage suggests to me that it's not there, but you can imagine it. Understand suggests to me that the board is saying that a person of skill in the art would understand the limitation to be present in the disclosed prior art reference. So that distinction, it seems to me it's not saying envision in the way we usually would use that word. I understand that distinction. We think that the passage kind of read in context suggests that understood meant that the board, by using the word understood, really was conveying that the skill artisan would recognize, would derive from this. It's closer to envision. And as we said, this is in our blue brief, we presented that we had expert testimony from our expert that, in fact, someone skilled in the art would not understand the claim that way. So we do think that the court... Right, but that's really a substantial evidence issue if you get past the question of whether this is a Genentech type finding. Yes, Your Honor. If this court believes that this falls within what Genentech said is permissible, then yes, that becomes a substantial evidence, which is a much harder hurdle for us. We do think that this is, you know, we do think that this is really more firmly within the Neideck-Motter type of immediately in this issue. I see that I'm on my rebuttal time. Could I just ask you another thing about your request for reconsideration and on bingo? If we were to conclude that your claim 18 bingo-centric part of your recon request was limited to this legal argument about Genentech versus Neideck, and then we concluded as a court that what happened here in the board was on the Genentech side of things, then that would raise the question of what harm was there even if it was inappropriate to convert your reconsideration request to a request for director review on the bingo question, because the bingo question has been resolved as a legal matter by us at the Federal Circuit. We think that if this court resolves this appeal solely as a legal matter under the consideration of Neideck and Genentech, then yes, that's a legal question that the court can make just as well as the agency. We also presented the argument that the board should not have analyzed the references in combination when relying on bingo. That, we think, involves factual determinations. And also the question whether the board correctly re-characterized the claim 18 and then correctly performed the analysis, the impendability analysis under that characterization, we also think has factual elements. So in that sense, this court needs to know what is or what would have been the proper final decision by the agency. Counsel, as you can see, your time has expired. But we'll give you three minutes for a bubble. Thank you, Your Honor. Before you sit down, just a ministerial question. Pages 31 through 37 of the third-party requester's comments are not in the appendix. They're cited at various points in the record. Could you provide those to us, or one of the parties provide those to us? Yes, absolutely. I would like to read those pages. And I think there is also not provided the full request for the RAN, writing appeal notice. Could you provide us with that? I wasn't able to find the first online. For some reason, the Patent Office didn't seem to have it in the docket. But if you could provide us with those three documents. We absolutely will. We'll provide full copies of both. And I apologize if they were not in the appendix. You didn't cite them yourself, and the other side didn't cite them. So under our rules, what you did was fine. But it's just nice to have them there, because they were cited elsewhere in the record. Yes, we will submit those to the court. Ms. Craven for the Patent Office. You have two minutes. Thank you, Your Honor. You can let it slip a little bit if you need to. Thank you, Your Honor. May it please the court. Vernetix's reply brief makes clear that the crux of its complaint about its director review is specific to the facts of this case, and that it didn't understand the board would interpret whatever remedy was provided by Arthrex as a request for director review. But a request for director review is the exact Arthrex remedy that Vernetix itself sought in another appeal before this court. And it's the exact Arthrex remedy, the request for director review, that this court ordered in that case. And that order is incited at the blue brief at page 43, and that's the 191671 case. And that was all while its request for rehearing was pending in this case. So Vernetix clearly had noticed that the office was treating pre-Arthrex IP reexam board decisions with requests for director review, because that's the exact Arthrex remedy. Did it have notice that it was going to be limited to an either-or situation, that it wouldn't be able to have both a request for reconsideration, which it clearly asked for, and then in addition the remedy provided by the Supreme Court? The guidance that the office put out a week after Arthrex made clear how the office was treating dual requests for director review and panel re-hearing as just requests for director review. But that was after this petition was filed. It was two weeks after this petition was filed, but Vernetix is not saying that they didn't have notice of the guidance. They just said that they didn't request director review. Well, they certainly told me they didn't have notice. They say it was unpublished at the time, and how did they know? Well, they knew during the course of their, while their re-hearing request was pending, because it's true, when they filed their request for re-hearing, we didn't know what the Arthrex remedy was going to be by the Supreme Court. So it presumes that they're asking for a remedy that's not known, but that became clear while the re-hearing request was pending, that it was going to be for pre-Arthrex for decisions or requests for director review, and that the agency was treating dual requests as just requests for director review. So you would propose that, I take it from what you say, that what they should have done is after Arthrex came out, and after you announced your policy of one to a customer, that they should have come in and withdrawn their petition to the extent that it's understood to be directed to director review and said, by the way, we are asking only for board review, not for director review. Yes, that would have been a simple way to avoid this side litigation about which particular agency review they wanted. The Arthrex questions and answers did make clear that if parties had case-specific questions about Arthrex's implication for their specific case, that they should reach out to the board. So why wouldn't it have been reasonable for Vernetics in this case to assume that you would read the last sentence of their petition as indicating a request for a specific application of Arthrex to their case, i.e., not something that would trigger director review? Sorry, I'm not sure I quite understand the question. Well, in other words, you're saying, well, what they should have done is that after Arthrex was decided and after the policy was announced, they should have come in and said, no, no, no, we're not asking for director review, but my question is why wasn't it reasonable for them to assume that nothing they said was actually invoking the right to director review, but rather, why wasn't it reasonable to assume that all that their petition was saying is that we want board review, which the board can give, including that the board can give any remedy that the Supreme Court has announced in Arthrex? They said whatever remedy was provided by Arthrex, and the remedy provided by Arthrex couldn't be provided by the board because, as they argued to this court for their IP re-exam from a pre-Arthrex board decision, the remedy was a request to the head of the agency for director review. So the board couldn't have provided that. Now I'm confused. Okay. Are you saying that if, okay, I have a petition for re-hearing. What I want is I want the board to fix the problems that I think came up in the board's opinion. And for that, I want to go back to the board. I also want to take advantage of anything that happens in the Supreme Court. Of course, I don't want to waive my rights under the decision in Arthrex. So it would seem to me that unless you're saying that you are going to cut out your right to board review, excuse me, to board review of the specific items that you think the board got wrong and all of the procedures that the board typically follows in the course of that kind of review, that they have to waive those in favor of what may well be and turned out to be a much more limited director review with a much more limited discussion of reasons. That seems odd to say they have to pick one. They cannot make a request for the board to say whatever remedy it is that they're entitled to. And then if they're entitled to director review, have director review. That could be one way of reading it. The director review remedy was actually a broader review than the panel rehearing. The interim guidance provided that director review could be a review of any question of law or fact, and it was de novo review. So it was not actually a more limited review that they got. It was a broader agency review, whereas the panel rehearing would just be whether the panel misapprehended or overlooked anything. And their request for rehearing the issues that they identified for the board would have been then the issues that were identified for the head of the agency at the time to review. So the denial of that may not have given them the reason for the denial, but it was a broader review that they got, and to some degree now the fact that they would like to go back for the narrower panel rehearing is sort of wrapped up in the director, the head of the agency's denial of director review at the time. It's true the board could have said, could have maybe issued an order that you're going to get the remedy provided by Arthur as its director review, but I think the board just... That would have been within the power of the board. Yes, it would have. But I don't think the board thought there was any question about what they wanted. They preserved a remedy provided by Arthrex, and that was the review by the head of the agency at the time, a broader review than they would have done as a panel. So... Ms. Craven, you asked for two minutes. Right. If there are no other questions... One more thought to convey. Vernetics Council did say their harder argument was whether Commissioner Hirschfeld actually denied it on the merits of the patentability argument. I would say one clear evidence that he did was that in a case where they gave an improper request for director review, the panel then told them it was an improper request and decided the case on panel rehearing from a post-Arthrex case. So the agency doesn't deny director review when there's an improper request. Thank you, Ms. Craven. Mr. Fougere, would you set it for 13 minutes for Mr. Fougere? Have I pronounced your name correctly? You have, Judge Lurie. Mr. Fougere, maybe I keep asking the wrong person, but is there pending litigation on this expired patent? You may be asking the wrong person. I don't think so, at least as far as Apple is concerned. Claim 18, which we think is the only claim still at issue here in light of Mangrove, that claim has never been asserted against Apple in litigation. I'd like to start, if I could, with the inherency point that both Judge Jen and Judge Bryson were talking about. I just want to make clear, this was an inherency argument through and through, and the Board understood it as such. On Appendix 44, where the Board is laying out the arguments presented to it in the appeal by Vernetics, the concluding sentence in the paragraph that carries over says, "...and the position that such a step would be inherent in the bingo router is not sufficiently supported," citing back to Vernetics' appeal brief. Then, on page 45, the Board rejects that argument, citing Apple's request for comments, which is at Appendix 6299, which preceded the appeal brief argument. So, at Appendix 6299, Apple said an error message necessarily would have been returned. That's the language of inherency. Vernetics comes back in its appeal brief and says, "...this isn't inherently disclosed," and the Board rejects the argument. This is Genentech through and through. There is no missing limitation. It's inherency, and that's what the Board understood it was doing, and that's what the Board found against Vernetics. If I could, I'd also like to clean up a little bit what's at issue. I started by saying only Claim 18 is at issue, and I think the 28J letter is in Genentech. Claim 11 was raised in the 28J, and in one paragraph in the original brief. Exactly, and our position is that that argument was not sufficiently developed and therefore waived under cases like Smith-Klein v. Apotex, which is 439F3rd 1612. But doesn't the appellant's incorporation by reference argument with respect to BINGO-UG and BINGO-EFR necessarily touch on the BINGO-related rejection of both Claims 11 and 18? The arguments as they framed them on Claim 11, so the statement of issues at page 12. I'm just trying to make sure that I am following correctly. All their arguments related to BINGO, inherency or not inherency, incorporation by reference or not incorporation by reference, that aspect, your side needs BINGO-EFR to be part of BINGO-UG for the Claim 11 rejection to work. Isn't that right? Yes, but under obviousness for Claim 11. So Claim 11 is an obviousness rejection, not an anticipation rejection. The pieces of BINGO-EFR that go to setting up a VPN, configuring it and all that, you need that in order to match up with the limitations of Claim 11. Yes, and my point in saying that the argument wasn't sufficiently developed under obviousness is simply that all they have is a throwaway sentence in their blue brief saying, while obviousness permits the combination of multiple references, the Board didn't make the requisite findings. I don't know what the requisite findings mean, because when one reference points to another under obviousness, that's perfectly acceptable. But even if considered on the merits, the point is simply wrong. The Board made repeated findings that a skilled artisan would have combined both BINGO and READ, that's at Appendix 46, and the BINGO User Guide and the EFR. At Appendix 35, the Board says directly that it's not persuaded that the documents wouldn't be combined for independent Claim 10, from which Claim 11 depends. So the Board made the findings. Again, the only argument, it's hard to figure out, there's a citation to Graham v. John Deere, and they simply say, we refer back to the anticipation points. My point is simply, it's an even looser standard under obviousness, and certainly what the Board did met that standard. Is the question of whether a reference incorporates by reference another reference, a question of law, a question of fact, or a question of law based on underlying findings of fact? I think it's more like the last one, law based on underlying findings of fact. This Court has said it's a question of law. There's been some reference to the law of contracts and how you address it. But it's certainly in reading what the BINGO User Guide teaches and whether it says go here for a particular document, that sounds an awful lot like the regular old anticipation argument about what does a particular reference teach, which is of course a factual finding. But whether review does a question of fact or a question of law, this reference clearly meets the standard. We cited the Callaway case in which reference was made to another document that wasn't even by the same authors for a particular point. They don't cite Callaway at all in their reply brief. It was our lead case. I think that's quite telling. The citation, whether viewed, again, as law or fact, from the User Guide to the EFR for very specific things is sufficient to meet this Court's standard under Callaway and other cases. You state in your brief that the two references, BINGO UG and BINGO EFR, if I've got it right, were in the same box. You don't come back and say, well, that's attorney argument. There's nothing in the record to support that. Is there anything in the record to support that? There is. The box specifically, I don't think the word box appears in the record, but at Appendix 35, the Board cites the documentation for BINGO, and that then points to Appendix 2376, which speaks of the BINTEC document. 2376, did you say? Yes, that's in the first volume of the appendix, Judge Bryson, somewhere roughly in the middle. And that BINTEC documentation says, Together with BINGO you will have received documentation partially in printed form and completely in electronic form, including on the BINTEC companion CD, and that includes, of course, the extended reference document. So it doesn't say it's the same box explicitly, but this is the late 1990s. It's a router. So you may remember routers and computers would come in boxes. There would be a bunch of leaflets in there, and then there would be a CD that has everything. What this is saying is here's what you're going to get. It includes the user guide and the extended feature reference. So I think that is, again, sufficient under this Court's case law, particularly when it's by the same author related to the same product. Now, there is an argument made with respect to BINGO, and I think this is their expert testified or introduced a declaration saying that even accepting that BINGO is a single applicable reference, it still doesn't get you there. I think that's Dr. Karamidas, and this is paragraphs 163 and 164 of his declaration. That's at 4122 and 4123. Could you address that argument? That argument, my recollection is, other than, of course, the Board found to the contrary, and this is substantial evidence review. That argument, I don't believe those particular paragraphs were even cited by Vernetics to the Board, and I think that points to an important aspect of this case that requires taking into account when analyzing, and in some respects I'd say nitpicking what the Board did. This is an inter-party re-exam. The case as it comes to the Board is how Vernetics presents it. There's an examiner who makes a bunch of findings, and then the appeal is what dictates what the Board sees. It's very different from an inter-party's review where the Board is analyzing it for the first time. So when Vernetics comes in on appeal and says, look, we have this expert who pointed to particular paragraphs showing why BINGO doesn't, in fact, anticipate, but it never told the Board to look at those paragraphs, that's just, we think that argument is plainly forfeited and shouldn't be considered. I'm just trying to find it here. Well, page 32 of their brief, their blue brief, is the one that talks about Dr. Karolides. It does cite one of the paragraphs. Actually, I guess both, at least quotes from those paragraphs. Now whether that's a developed argument on that is another question, I suppose. My point is that they didn't cite them to the Board. Oh, I see. You're not talking about not citing them. No, I'm saying because this is an inter-party's re-exam, the appellant to the Board dictates the issues as presented to the Board. And so to come in on appeal here and say, look, here are these paragraphs that show something that is contrary to what the Board found, I think is just fundamentally improper. The Board takes the case as the appellant presents it from the examiner. None of these paragraphs were cited to the Board, which we pointed out in our red brief on page 37. Okay. The green brief doesn't dispute that these passages were not presented to the Board in their gray brief. I don't think so. Okay. And I think just to touch briefly on the Bloom, Beeser, and Kent objections or rejections, which, again, the Court doesn't have to reach if it finds that Bingo anticipates, the same point applies. The way that this case comes to the Board is as the appellant presents it. And that's what you see the Board doing. The Board says at the outset, look, I think this is kind of strange and we've never heard an explanation for why the claim makes any sense as written, but I'm going to now tick through each of the arguments that Vernetics made to me, citing back to Vernetics' appeal brief at 69-65 and saying we think Vernetics is wrong. And therefore, we are going to affirm what the examiner found. And that setting is an important context in which to consider this case and this appeal because, again, the Board takes the case as it's presented. And what the Board is doing here is starting off with an observation before then proceeding to say, these are the three arguments that Vernetics has presented to me and I don't believe them. I don't buy them. And on appeal, Vernetics has no substance behind its objections. All they say are the Board wrote different words than are in the claim. That's what you see at pages 26-27 of their appeal brief. But there's never any attempt to show why that matters because it doesn't. The Board understood fully what it was doing. It rejected the arguments Vernetics made, siding with Apple, and, as a result, affirmed the examiner's findings. Do you think the Board erased the distinction between secure computers, non-secure computers? No. No, I think what the Board was saying was simply it doesn't make sense to determine first if you are talking about a secure computer and then later, before setting up a VPN, asking whether you're authorized to access a non-secure computer. But what the Board was saying was it doesn't matter because the art discloses both. And if the art discloses both, it discloses one and the other. So I don't think the Board was erasing any distinction whatsoever. Just briefly, one last thing. Before I sit down, because it came up in the 28-J letter. For Claims 10 and 12, just to clean that up, our position is that this is clear collateral estoppel. There's no reason, as Judge Lurie, as you said, in an earlier argument, to take the extraordinary step of vacater. That's what this Court, in Aranachalem, which is an unpublished opinion, but at 709 Fed Appendix 699, the Court simply affirmed, based on an application of collateral estoppel, rather than going any further, the collateral estoppel effect of mangrove is immediate and it means that Claims 10 and 12 are out. Go ahead. This raises the question of a much broader application of what we do in situations in which something happens in the midst of a case that renders the significance of our action zero. And it calls to mind the Bonner-Mall case, which you may be familiar with, where the Supreme Court backed away, at least in that context, from the notion under Munson, that once the case no longer has practical application, they have to vacate everything all the way back to the beginning. The Supreme Court said, no, it's a much more delicate inquiry than that. That's exactly right. In the facts of this case, what's the argument for or against vacating all the stuff that applies to the claims that have been invalidated under the Mangrove Partners case of March? Yeah. Well, I think it's important to start, Judge Bryson, with the Bonner-Mall case, because what that case says is vacater is an extraordinary remedy on which the burden is frenetics, to say that that applies. I don't think a single sentence in a 28-J letter that says nothing other than this case is therefore vacate meets that burden. But it also doesn't really fit with what Bonner-Mall and Munson have come to say are the circumstances, and in the case they cite, false par, in which vacater makes sense. That equitable doctrine takes into account an appellant's inability to challenge the case based on the vagaries of circumstance or the winning party doing something to effectively move the case. In Valspar, the winning party had granted a covenant not to sue, and so the courts say, in that circumstance, it doesn't really make sense to hold the appellant or to keep on the books the decision in which the appellant lost. Nothing like that is going on here. This is instead a straightforward application of collateral estoppel and its immediate preclusive effect, the same way this court has applied it in X, Y, the same way, again, in Oranichelum, the court applied it, and it simply means that the court should affirm rather than vacate. Thank you. Thank you, counsel. Mr. Timmons, please, as the hearing is almost on. Thank you, Your Honor. So with respect to the request for rehearing, so one point I would make is the policy, this policy of differentiating between the pre-RFREX and post-RFREX request, that was never published, announced in any kind of public or even internal guidance. It really is something that the PTO said only in this case and in the parallel appeal that's pending before this court. In this case also, somewhat differently situated from those instances where PTO accepted a remand, a limited remand from this court for decisions issued prior to RFREX. In those cases, because the appeal was already before this court, there was no way for the PTO to then provide a direct rehearing and kind of clear up what they call a constitutional cloud. Here, the case was still before the agency, so Commissioner Hirschfeld may have, again, claimed the power to correspond to rehear the case and may have taken the view that he has that power. Let me see if I understand exactly what you're saying. Are you saying that the announcement of the policy that came after RFREX and after the petition in this case was filed did not cover cases such as yours in which the petition, the request for a rehearing, was filed before the decision in RFREX? No, Your Honor. I'm talking about two different policies. I apologize. The interim policy where the PTO said that you can either have one or the other, that our understanding is they took a position that covers everything. It was the different policy where they said that we made an exception to that policy for actually allowing direct reviews. We made an exception to the policy of not allowing direct reviews for decisions that we should pre-RFREX. That policy was never announced in any kind of formal publication, Your Honor. Okay. But you could have, presumably, after RFREX, you could have gone in and said, we now want to focus just on the board. Once the announcement was made that you couldn't get sequential review from both the board and the director. Your Honor, we could have. The PTO also could have said, it is unclear to us what you're requesting because you filed your request prior to RFREX. Which one do you want? So I agree that neither side has done that.  Turning to incorporation, we actually made the argument with respect to why incorporation does not satisfy what the score is demanding standard. This is on pages 33 through 36 of our blue brief. We think there are several cases that were cited, including Kiyosara and others. On the question of whether it was in the same box, we addressed that point on page 17 of our gray brief. Again, we don't think the record conclusively shows which versions of the extended feature reference were, in fact, included with it being the user guide. On the Baker-Chin point, I would just point this court to, I acknowledge that the Bonne and Moll and Bancroft clarified the standard amongst them, where I would point this court to what it did in appeal number 17-2594, companion appeal to the one that my colleague just argued immediately preceding. And there this court basically concluded the appeal was entirely moot, and vacated and remanded it to the PTO with instructions to vacate the PTO's underlying decision as moot. It is fair because where the PTO relied on issues and findings that we can no longer challenge because the overall claim is now unpatentable, it is fair, we think fair and equitable, to vacate that decision as moot. If I could just ask one more question. What practical effect would that have on any case that's out there? I mean, the difference between vacating and simply having the decision out there. Ioana, it may not, because again, I think these, I'm not aware of the, there is a little bit of a cost issue still percolating in this record, but there is no active litigation on these patents, so that may not have practical effect. There may be some implications for the appeal we hear next, which also involves Claim 18. So in terms of practical applications, it may not matter, we think, that it's an appropriate thing to do where a claim is unpatentable and therefore issues underlying the Board's rejection of a claim are now moot. It's not the kind of more traditional collateral estoppel where the exact same issue was considered in another proceeding, and we're now estoppel contesting that issue. Thank you, counsel. The case is submitted.